(Slip Opinion)

# Whether the Equal Credit Opportunity Act Creates Disparate-Impact Liability

The Equal Credit Opportunity Act does not create disparate-impact liability. The statute's textual focus on an actor's mindset, as opposed to the consequences of his actions, demonstrates that it contemplates liability only for intentional discrimination. And other indicators of statutory purpose cannot overcome the statutory text.

June 12, 2026

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
FEDERAL TRADE COMMISSION

In 1971, the Supreme Court held for the first time that a person may be held liable for discrimination under certain federal statutes without proof of discriminatory intent. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971). On this view, liability can hinge on whether a person's actions disparately impact a protected class. *Id.* But the Supreme Court has since made clear that disparate-impact liability is not the default interpretation of antidiscrimination statutes, and it has extended the disparate-impact theory of discrimination in only a few other contexts. *See, e.g.*, *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545–46 (2015); *Smith v. City of Jackson*, 544 U.S. 228, 240 (2005).

You have asked whether the disparate-impact theory extends to the Equal Credit Opportunity Act ("ECOA"), which the Federal Trade Commission ("FTC") enforces against discrimination in credit transactions. *See* Pub. L. No. 93-495, tit. V, 88 Stat. 1521 (1974) (codified as amended at 15 U.S.C. § 1691 *et seq.*); *see also* 15 U.S.C. §§ 1691(a), 1691c(c). The answer is no. Under the plain meaning of ECOA's text and the analysis required by current Supreme Court precedent, ECOA creates liability only for intentional discrimination. Of course, disparate impacts may sometimes suggest intentional discrimination. *Ricci v. DeStefano*, 557 U.S. 557, 595 (2009) (Scalia, J., concurring). But even then, it is always the intentional discrimination—not the disparate impact itself—that gives rise to ECOA liability.

## I.

Although the Supreme Court has never interpreted ECOA to provide for disparate-impact liability, the FTC has. This interpretation raises

1

serious constitutional concerns, because "disparate-impact liability tends to incent" and can "even coerce" discrimination. *See Constitutionality of Disparate-Impact Liability Under Title VII*, 50 Op. O.L.C. __, at *8 (June 9, 2026) ("*Disparate-Impact Liability*"). It also imposes significant financial costs on businesses and consumers. To avoid disparate-impact liability, businesses spend millions of dollars every year evaluating whether facially nondiscriminatory conduct may have different effects on different demographics. *See Chamber of Com. v. CFPB*, 691 F. Supp. 3d 730, 740 (E.D. Tex. 2023); *cf.* Declaration of Thomas Quaadman in Support of Plaintiffs' Motion for Summary Judgment at 8, *CFPB*, 691 F. Supp. 3d 730 (No. 6:22-cv-381), Dkt. 17-1 (noting that a regulator's interpretation of a single statute to create disparate-impact liability can increase a company's compliance costs by over $1,000,000 per year). Many of these costs are passed on to consumers, attaching practical consequences to any extension of the disparate-impact theory. *See* OMB Circular No. A-4, *Regulatory Analysis* at 9 (2023).

## A.

As the Supreme Court has recognized, discrimination is "most easily understood" to describe "[d]isparate treatment"—using a protected characteristic as a reason for "treat[ing] some people less favorably than others" even though they are similarly situated in all material respects. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Thus, statutes that declare discrimination unlawful reflect a judgment that certain differences should be treated as immaterial in the interactions that those statutes govern.[1]

Disparate-impact liability strains this ordinary concept of discrimination by suggesting that a person may unintentionally discriminate based

---

[1] *See, e.g.*, Helen Norton, *Discrimination, the Speech that Enables It, and the First Amendment*, 2020 U. Chi. Legal F. 209, 209 (2020) ("Antidiscrimination laws forbid employers, housing providers, insurers, lenders, and other gatekeepers from relying on certain characteristics in their decision-making."); Robert Post, *Prejudicial Appearances: The Logic of American Antidiscrimination Law*, 88 Calif. L. Rev. 1, 8 (2000) ("Antidiscrimination law seeks to neutralize widespread forms of prejudice that pervasively disadvantage persons based upon inaccurate judgments about their worth or capacities."); *see also* S. Rep. No. 94-589, at 3 (1976) ("In short, [ECOA] identifies characteristics of applicants which the Committee believes are, and must be, irrelevant to a credit judgment, and prohibits or curtails their use.").

on differences that never mattered to him and of which he may not even have been aware. Under a disparate-impact regime, a person may be liable for discrimination even if the qualities he considers are *not* placed off-limits by statute, if he inadvertently causes a disparity that correlates with a protected characteristic. This effectively unwinds the standard logic of antidiscrimination laws by conflating decisions based on protected characteristics and decisions based on neutral qualities.

Still, the Supreme Court has held that Congress can reach beyond the natural meaning of discrimination by setting aside the term's implicit intent requirement and imposing liability for disparate-impact discrimination—a secondary meaning of "discrimination" that is admittedly not as "obvious" or as "easily understood" as disparate treatment. *Id.* Where Congress embraces this supplemental theory of liability, "discrimination" can refer to "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.* at 335–36 n.15. In other words, it can occur by happenstance even when a defendant engages in "practices that are *not* intended to discriminate." *Ricci*, 557 U.S. at 577 (emphasis added); *see also Inclusive Communities*, 576 U.S. at 524–25 (citing *Ricci*, 557 U.S. at 577).

Some statutes expressly provide for liability "based on disparate impact." *E.g.*, 42 U.S.C. § 2000e-2(k)(1)(A). Other statutes contain similarly explicit bans on practices that result in disproportionately negative outcomes for certain statutorily protected groups. *E.g.*, Emergency School Aid Act, Pub. L. No. 92-318, tit. VII, § 706(d)(1), 86 Stat. 354, 357–58 (1972) ("ESAA") (withholding federal funds from educational agencies having "any practice, policy, or procedure which results in the disproportionate demotion or dismissal of instructional or other personnel from minority groups"); Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 102(b)(3), (6), 104 Stat. 327, 332 (codified at 42 U.S.C. § 12112(b)(3), (6)) ("ADA") (defining unlawful "discrimination" to include the use of "selection criteria that screen out or tend to screen out an individual with a disability" or "that have the effect of discrimination on the basis of disability"). The Supreme Court has concluded that these statutes, too, impose disparate-impact liability. *See Bd. of Educ. v. Harris*, 444 U.S. 130, 143 (1979) (ESAA); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (ADA).

In *Inclusive Communities*, the Supreme Court held that antidiscrimination statutes must also be "construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose." 576 U.S. at 533. The Court has so far situated three laws that lack explicit disparate-impact provisions under this rubric. *See Griggs*, 401 U.S. at 426 n.1 (interpreting Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241); *Smith*, 544 U.S. at 235–36 (plurality opinion) (interpreting the Age Discrimination in Employment Act of 1967, Pub. L. No. 90-202, 81 Stat. 602 ("ADEA")); *Inclusive Communities*, 576 U.S. at 534 (interpreting the Fair Housing Act, Pub. L. No 90-284, tit. VIII, 82 Stat. 81 (1968) ("FHA")).

**B.**

Before the Supreme Court's decision in *Inclusive Communities*, federal agencies relied on legislative history to impose disparate-impact liability under ECOA. Those interpretations have now been called into question, and the FTC has requested this Office's opinion on whether the statute reaches beyond intentional discrimination to prohibit unintended disparate impacts.

Congress enacted ECOA in 1974, making it "unlawful for any creditor to discriminate against any applicant on the basis of sex or marital status with respect to any aspect of a credit transaction." ECOA § 503, 88 Stat. at 1521. Congress has since expanded the statute's scope, so that ECOA now makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction," (1) "on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)," (2) "because all or part of the applicant's income derives from any public assistance program," or (3) "because the applicant has in good faith exercised any right under [chapter 41 of the United States Code]." 15 U.S.C. § 1691(a).

Although the Supreme Court has never reached the issue, relevant Executive Branch agencies and some lower courts have interpreted ECOA to impose disparate-impact liability based on the statute's legislative history. In 1977, the Federal Reserve Board interpreted ECOA to provide for

disparate-impact liability based on the legislative history of ECOA's 1976 amendments. *See* 42 Fed. Reg. 1,242, 1,255 n.7 (Jan. 6, 1977). Some lower courts have also recognized disparate-impact liability under ECOA—either without evaluation, in reliance on legislative history, or in reliance on past judicial or agency interpretations that relied on legislative history.[2] The FTC relied on these authorities in formulating its own view of ECOA. Joint Statement of Lina M. Khan, Chair, FTC, Rebecca Kelly Slaughter, Commissioner, FTC, and Alvaro M. Bedoya, Commissioner, FTC, at 1–3 (Aug. 15, 2024), https://perma.cc/9T5Y-YPTM ("Joint Statement"). Thus, the FTC's interpretation of the statute to provide for disparate-impact liability ultimately rests on legislative history.

This interpretation of ECOA has been called into question by the Supreme Court's growing emphasis on statutory text as the lodestar of legal meaning, including in the specific context of disparate-impact liability. *See Inclusive Communities*, 576 U.S. at 531–33. For instance, the Consumer Financial Protection Bureau ("CFPB") asked our Office for informal advice on whether its interpretation of ECOA to provide for disparate-impact liability based on legislative history remained reasonable after the Supreme Court's decision in *Inclusive Communities*. At that time, *Chevron* deference gave controlling weight to an agency's "reasonable interpretation" of an ambiguous statutory provision. *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). In that context, our Office advised that ECOA could reasonably be interpreted to embrace disparate-impact liability even though it lacked the textual indicators emphasized in *Inclusive Communities*. E-mail for Mary McLeod, Consumer Financial Protection Bureau, from Liam Hardy, Office of Legal Counsel, *Re: Informal Query re ECOA* (Feb. 1, 2018, 11:35 AM).

---

[2] *See, e.g.*, *Bhandari v. First Nat'l Bank of Com.*, 808 F.2d 1082, 1101 (5th Cir.) (citing district court cases that rely on legislative history for the proposition that ECOA imposes disparate-impact liability), *on reh'g*, 829 F.2d 1343 (5th Cir. 1987), *cert. granted, judgment vacated*, 492 U.S. 901 (1989), *and en banc opinion reinstated*, 887 F.2d 609 (5th Cir. 1989); *Golden v. City of Columbus*, 404 F.3d 950, 963 n.11 (6th Cir. 2005) (assuming that ECOA imposes disparate-impact liability based on "cases in the federal district courts, one court of appeals case, and ECOA's legislative history"); *Coleman*, 196 F.R.D. at 325–26 (finding "support indicating that a disparate impact theory can be used in ECOA cases" in ECOA's legislative history as recounted in "the relevant federal regulations").

We have not previously opined on the "single, best meaning" of ECOA. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). That is a different question than the one posed to us under *Chevron*. *See Interpretation of "Federal Means-Tested Public Benefit" in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 49 Op. O.L.C. __, at *6–7 (Dec. 16, 2025) ("*Interpretation of PRWORA*") (overruling prior opinion that relied on *Chevron* because, "[l]ike the judiciary, we seek the best meaning of the statutory text" (quotation marks omitted)). Now that *Loper Bright* has eliminated *Chevron* deference, we confront the question of ECOA's best meaning for the first time. *See Loper Bright*, 144 S. Ct. at 2266.

## II.

ECOA does not expressly impose disparate-impact liability, as some other statutes do. Nonetheless, under the Supreme Court's opinion in *Inclusive Communities*, "antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose." 576 U.S. at 533. That does not describe ECOA.

## A.

"As with any question of statutory interpretation," the *Inclusive Communities* analysis "begins with the plain language of the statute." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). It asks whether the statutory text refers to "the mindset of actors" or "to the consequences of actions." *Inclusive Communities*, 576 U.S. at 533. ECOA's text focuses on intent and makes no reference to impact, ruling out the possibility of disparate-impact liability.

### 1.

ECOA penalizes intentional discrimination by making it unlawful for a creditor to "discriminate against" any applicant for credit "on the basis of" or "because" of a protected characteristic. 15 U.S.C. § 1691(a).

To "discriminate against" a person generally requires an awareness of difference. At its most basic level, to "discriminate" is "to . . . recognize as being different from others" or "to . . . distinguish between or among." *Webster's Third New International Dictionary* 648 (1971 ed.); *see also Black's Law Dictionary* 553 (rev. 4th ed. 1968) (defining "discrimination" to mean, "[i]n general, a failure to treat all equally; favoritism"). To "discriminate *against*" a person, then, is "to distinguish [him] unfavourably from others." 4 *The Oxford English Dictionary* 758 (2d ed. 1989). Thus, an actor will not ordinarily be understood to have "discriminated against" someone unless he was cognizant of that person's differences and intentionally decided to prefer others as a result. *See Teamsters*, 431 U.S. at 335–36 n.15; *see also Murray v. UBS Sec., LLC*, 144 S. Ct. 445, 453 (2024) (noting that "the 'normal definition' of 'discrimination' is 'differential treatment'" (citation omitted)).

The causal language that ECOA uses to link the term "discriminate" with various protected characteristics confirms that the statute requires the intent generally implicit in the concept of discrimination. ECOA prohibits discriminating "on the basis of" or "because" of certain characteristics, including race, sex, and marital status. 15 U.S.C. § 1691(a). "[T]he ordinary meaning" of such causation requirements "is that [the protected characteristic] was the 'reason' that the [defendant] decided to act." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009); *see also Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 & n.14 (2007) (noting that "because of" means "based on" and that "'based on' indicates a but-for causal relationship"). Accordingly, there would be significant linguistic tension in saying that a creditor *unintentionally* discriminated "on the basis of" or "because" of a protected characteristic, especially if it was a characteristic of which the creditor was wholly unaware. *Cf. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) ("[R]etaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination.").[3]

---

[3] *Inclusive Communities* is not to the contrary. It rejected the argument that the natural meaning of the phrase "because of" categorically "*forecloses* disparate-impact liability," holding that other indicators of congressional intent may sometimes be sufficient to establish disparate-impact liability in a statute that uses such causal language. *Inclusive Communities*, 576 U.S. at 533, 535 (emphasis added). But none of the textual, structural,

In short, ECOA's mandate not to "discriminate against" credit applicants would ordinarily be understood to prohibit disparate treatment of such persons due to their protected characteristics, and its causal language underscores that the discrimination ECOA prohibits occurs only when an applicant's protected characteristic is a conscious factor in the creditor's decision. *See Gross*, 557 U.S. at 176. A decision made without taking account of a protected characteristic would come out the same way even if that characteristic were different, failing ECOA's causation requirement. *Cf. Burrage v. United States*, 571 U.S. 204, 211–15 (2014) (explaining that "because of" or "but-for" causation exists when changing an input changes the outcome, not when the outcome "would have [happened] in any event").

But the disparate-impact theory of liability dispenses with the causal link that is supplied by discriminatory intent and required by ECOA's plain text. The theory asserts that a person may discriminate accidentally, without using a protected characteristic as a motivating factor in his decisions.[4] This runs contrary to ECOA's text, making clear that disparate-impact discrimination lies outside the statute's scope. Instead of targeting accidental disparate impacts, ECOA targets intentional disparate treatment.

---

and historical indicators on which *Inclusive Communities* relied to depart from the plain meaning of a causation requirement are present here. *See infra* Part II.B.

[4] To be clear, we do not doubt that it would constitute intentional discrimination within the meaning of ECOA for a creditor to make lending decisions based on a facially neutral characteristic that he chose *because* he believed it would correlate with a protected characteristic. The Supreme Court has held that whenever a protected characteristic "actually motivate[s]" the defendant's adverse actions, that is sufficient to create liability for intentional discrimination. *Ky. Ret. Sys. v. EEOC*, 554 U.S. 135, 142–43 (2008); *see also Ricci*, 557 U.S. at 577–78. The underlying discriminatory intent is the same whether a wrongdoer classifies persons based on a protected trait or on an unprotected trait purposefully chosen as its "proxy." *Ky. Ret. Sys.*, 554 U.S. at 142–43. "[F]or example, [if] an employer targeted employees with a particular pension status on the assumption that these employees are likely to be older," that would be a violation of the ADEA. *Id.* (cleaned up). This logic applies with equal force to ECOA. *See Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3d Cir. 2005) ("[C]ourts . . . recogniz[e] that a regulation or policy cannot 'use a technically neutral classification as a proxy to evade the prohibition of intentional discrimination,' such as classifications based on gray hair (as a proxy for age) or service dogs or wheelchairs (as proxies for handicapped status)." (citation omitted)).

## 2.

The conclusion that ECOA does not create liability for disparate impacts is confirmed by the statute's complete lack of "results-oriented" language. *See Inclusive Communities*, 576 U.S. at 534.

Every statute that the Supreme Court has interpreted to give rise to disparate-impact liability under the *Inclusive Communities* test begins with a prohibition on discriminatory treatment, followed by a "catchall" clause that is clearly results-oriented. *Id.* at 534–35. As *Inclusive Communities* explained, Title VII and the ADEA both contain language prohibiting actions that "deprive any individual of employment opportunities or *otherwise adversely affect* his status as an employee, because of such individual's race or age." *Id.* at 532–33 (quoting *Smith*, 544 U.S. at 235 (plurality opinion)). Similarly, section 804(a) of the FHA makes it unlawful to "refuse to sell or rent . . . , or *otherwise make unavailable* or deny, a dwelling to any person because of [their protected characteristics]." *Id.* at 533 (emphasis added) (quoting 42 U.S.C. § 3604(a)).

The Supreme Court has said that the phrases "otherwise adversely affect" and "otherwise make unavailable" in these three statutes refer to "the consequences of an action rather than the actor's intent." *Id.* at 534; *see also Smith*, 544 U.S. at 235–36 (plurality opinion) (emphasizing statutory phrase "otherwise adversely affect"); *Watson v. Ft. Wor. Bank & Tr.*, 487 U.S. 977, 990–91 (1988) (explaining that a practice creating a disparate impact "may be said to 'adversely affect'" an individual because of his protected characteristic (quoting 42 U.S.C. § 2000e-2(a)(2)). The Court also found it significant that these "results-oriented phrase[s]" are "[l]ocated at the end of lengthy sentences that begin with prohibitions on disparate treatment," and are introduced by the word "otherwise," because those features further "signal[] a shift in emphasis from an actor's intent to the consequences of his actions." *Inclusive Communities*, 576 U.S. at 534–35; *cf. Harris*, 444 U.S. at 143.[5]

---

[5] The Supreme Court has never said that this "exact language" is required to conclude that an antidiscrimination statute "look[s] to consequences" in a manner that creates disparate-impact liability. *Inclusive Communities*, 576 U.S. at 535. But the statute must include terms that "bear the same basic meaning." *Id.* It must reference effects and not "simply prohibit[] actions." *Smith*, 544 U.S. at 235–36.

ECOA, by contrast, emphasizes *only* a creditor's intent. It prohibits the act of "discriminat[ing] against any applicant . . . on the basis of" or "because" of a protected status, 15 U.S.C. § 1691(a)—facially requiring that the creditor specifically *decide* to use a particular characteristic to distinguish among persons, *see Gross*, 557 U.S. at 176. ECOA contains none of the "results-oriented" features on which the Supreme Court has previously relied when deeming disparate-impact liability to be available under other statutes. It neither explicitly permits "disparate impact" claims, *Ricci*, 557 U.S. at 577, nor expressly bans practices "that have the effect of discrimination" or that "tend to" negatively impact persons with certain protected characteristics, *Hernandez*, 540 U.S. at 53 (quoting 42 U.S.C. § 12112(b)(5)–(6)); *see also Harris*, 444 U.S. at 143. Nor does ECOA contain any subtler "results-oriented language." *Inclusive Communities*, 576 U.S. at 534. It does not include the phrases "otherwise adversely affect" or "otherwise make unavailable," and has no comparable "catchall phrase[]"—or any phrase—"looking to consequences." *Id.* at 534–35.

ECOA is more like a former ADEA provision that the Supreme Court said would *not* create disparate-impact liability: a ban on "fail[ing] or refus[ing] to hire any individual because of such individual's age." *Smith*, 544 U.S. at 236 n.6 (plurality opinion) (cleaned up) (quoting ADEA § 4(a)(1), 81 Stat. at 603). As the *Smith* plurality explained, "[t]he focus of th[at] paragraph is on the employer's actions with respect to the targeted individual," not on "the individual employee who adversely suffers because of those actions." *Id.* The same is true of ECOA. The statute cannot "be read to encompass a disparate-impact theory" because its "text does not ask about 'the *effects* of non-differentiating [credit policies] that treat all individuals equally,'" and instead targets only the act of intentional differentiation itself. *Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*, 142 S. Ct. 1968, 1972–74 (2022) (citation omitted) (holding that a statute making it unlawful for a health plan to "differentiate in the benefits it provides between individuals having end-stage renal disease and other individuals" did not provide for disparate-impact liability because that result would be "atextual").

We are not swayed by the fact that *Inclusive Communities* also held disparate-impact liability to be available under section 805(a) of the FHA, which does not contain the phrase "otherwise make unavailable" and only

prohibits "discriminat[ing] against any person in making available [a real estate-related] transaction, or in the terms or conditions of such a transaction, because of" a protected characteristic. *Inclusive Communities*, 576 U.S. at 534 (quoting 42 U.S.C. § 3605(a)). ECOA differs materially from section 805(a). *Inclusive Communities* analyzed section 805(a) as essentially an outgrowth of section 804(a).[6] Of course, that provision contains "results-oriented" language—"otherwise make unavailable"—that the Court found "equivalent in function and purpose to" the "'otherwise adversely affect' language" in Title VII and the ADEA. *Id.* at 533–35; *see also id.* at 534 ("[T]he phrase 'otherwise make unavailable' is of central importance to the analysis that follows."). But ECOA "contains no such language." *Garcia v. Johanns*, 444 F.3d 625, 633 & n.9 (D.C. Cir. 2006) (assuming without deciding, at class certification, that disparate-impact claims may be cognizable under ECOA).

Even advocates for disparate-impact liability under ECOA acknowledge that "*Inclusive Communities*' textual analysis does not support ECOA disparate impact claims." Winnie F. Taylor, *The ECOA and Disparate Impact Theory: A Historical Perspective*, 26 J.L. & Pol'y 575, 627 (2018). We agree, and our statutory interpretation could stop here. As the Supreme Court and our Office have reiterated, other interpretive factors can never overcome clear text. *See, e.g.*, *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019); *accord Reconsidering the Authority of the Department of Veterans Affairs to Provide Abortion Services*, 49

---

[6] The only reference in *Inclusive Communities* to the specific text of section 805(a) was to say, citing *Board of Education v. Harris*, 444 U.S. at 140–41, that the Court "ha[d] construed statutory language similar to § 805(a) to include disparate-impact liability." *Inclusive Communities*, 576 U.S. at 534. Importantly, though, the language the Court referenced from *Harris* pertained to the *second clause* of an antidiscrimination provision in the ESAA. *Id. Harris* had concluded that, where the first clause in the provision "imposed . . . [a] disparate-impact test," "a similar standard" should apply to the "closely connected" second clause too. 444 U.S. at 143; *see also Inclusive Communities*, 576 U.S. at 583–84 (Alito, J., dissenting) (explaining that *Harris*'s logic rested on "the relationship between the [two] clauses"). The Court in *Inclusive Communities* thus appeared to reason that, if one provision of a statute contains results-oriented language (i.e., section 804(a)), that focus may be imputed to a closely related provision (i.e., section 805(a)). *See* 576 U.S. at 532–34. In no way does *Inclusive Communities* support the view that disparate-impact liability can be inferred when a statute is *wholly* devoid of such language, as ECOA is. *See Minn. Telecom All. v. FCC*, 175 F.4th 905, 924 (8th Cir. 2026).

Op. O.L.C. __, at *5 (Dec. 18, 2025). Antidiscrimination statutes are no exception: Disparate-impact liability is available only when that theory "represent[s] the better reading of the statutory text." *Smith*, 544 U.S. at 235 (plurality opinion). Where results-oriented language is absent, further analysis of statutory purpose is unnecessary. *See, e.g.*, *Marietta*, 142 S. Ct. at 1973–74 (concluding that disparate-impact liability was unavailable based on statutory text without evaluating statutory purpose). Because ECOA does not refer to results in the way that the Supreme Court has always required before concluding that an antidiscrimination statute penalizes disparate impacts, it is best read as prohibiting disparate treatment alone.

## B.

In addition to statutory text, *Inclusive Communities* looked to three indicators of statutory purpose—statutory structure, statutory history, and legislative history—and determined that all three reinforced its inference that the FHA's results-oriented language creates disparate-impact liability. *See* 576 U.S. at 535–39. There is no such inference to reinforce here, where ECOA wholly lacks results-oriented language. But even if ECOA included results-oriented language, none of these confirmatory factors would support reading ECOA to create disparate-impact liability.

## 1.

Beginning with statutory structure, the enumerated exceptions to ECOA's antidiscrimination provision provide no support for the idea that ECOA creates disparate-impact liability. To the contrary, the fact that Congress saw no need to create safe harbors against disparate-impact liability in ECOA, as it did in other statutes, arguably suggests that it did not contemplate such liability.

In *Inclusive Communities* and *Smith*, the Supreme Court found "convincing confirmation of Congress' understanding that disparate-impact liability exists under the [ADEA and] the FHA" in the fact that exemptions built into those statutes "assume the existence of disparate-impact claims." *Id.* at 537; *see also Smith*, 544 U.S. at 238–39 (plurality opinion). For instance, the Court explained that the ADEA's safe harbor for "differentiation . . . based on reasonable factors other than age" would serve no

purpose if the ADEA did not embrace disparate-impact liability, since "[i]n most disparate-treatment cases, if an employer in fact acted on a factor other than age, the action would not be prohibited . . . in the first place." *Smith*, 544 U.S. at 238 (plurality opinion) (citation omitted). The Court similarly reasoned that the FHA's "exemptions" for occupancy restrictions and adverse housing actions taken due to drug convictions "would be superfluous if Congress had assumed that disparate-impact liability did not exist under the FHA," because those exemptions only "constrain disparate-impact liability." *Inclusive Communities*, 576 U.S. at 537–38.

By contrast, most of the activities that ECOA lists as "not constituting discrimination" are expressly directed at carving away liability for what might otherwise be alleged to constitute *intentional* discrimination. *See* 15 U.S.C. § 1691(b). The statute allows creditors to "make an inquiry" as to an applicant's age, marital status, or assistance status—an intentional act with a direct link to those protected characteristics—so long as the creditor does so for reasons other than "discriminat[ing] in a determination of credit-worthiness." *Id.* § 1691(b)(1)–(2), (4). Permissible aims are limited to "ascertaining the creditor's rights and remedies," "determining the amount and probable continuance of . . . pertinent element[s] of credit-worthiness," or "exten[ding] . . . credit in favor of [an] applicant." *Id.* The statute similarly permits creditors to "consider[] age" within an "empirically derived credit system"—that is, to treat age as a relevant factor in a credit transaction—as long as "the age of an elderly applicant" is not explicitly "assigned a negative factor or value." *Id.* § 1691(b)(3).

Unlike the ADEA and FHA exemptions discussed in *Inclusive Communities* and *Smith*, the exemptions here serve a clear purpose if ECOA prohibits only intentional discrimination—as the courts have acknowledged. *See, e.g.*, *Massey v. First Greensboro Home Equity, Inc.*, 1998 WL 231141, at *11 (M.D. Fla. Apr. 27, 1998) (identifying a genuine material issue of fact as to a defense, mounted under section 701(b)(2) of ECOA, against a claim of intentional age discrimination). ECOA's exemptions identify and immunize specific instances where a creditor *has* intentionally considered an applicant's protected characteristic—and thus literally treated that applicant differently from others who lack it—but has not discriminated in the particular manner Congress deemed problematic. They do not, in the style of the ADEA and FHA exemptions, state that creditors may consider certain *non*-protected characteristics that

might *correlate* with protected characteristics. *See* 29 U.S.C. § 623(f)(1) (ADEA); 42 U.S.C. §§ 3605(c), 3607(b)(1), (4) (FHA). That specific move, which would be superfluous in a statute prohibiting only intentional discrimination, was the reason the Supreme Court found those other exemptions probative. *Cf.* Joint Statement at 2 & n.6 (implying that exemptions aimed at protected categories would not "confirm the availability of disparate-impact liability").

To be sure, section 701(c) of ECOA sets forth "[a]dditional activities not constituting discrimination" that are *not* expressly linked to a protected characteristic identified in section 701(a). 15 U.S.C. § 1691(c). Section 701(c) provides that it is not a violation of ECOA "for a creditor to refuse to extend credit offered pursuant to" a "credit assistance program" that is "expressly authorized by law for an economically disadvantaged class of persons"; "administered by a nonprofit organization for its members or an economically disadvantaged class of persons"; or "offered by a profit-making organization to meet special social needs." *Id.*

But like the exemptions already discussed, these exemptions provide meaningful limitations on liability for intentional discrimination and so do not support any structural inference that ECOA creates disparate-impact liability. They permit certain entities to discriminate *in favor of* protected groups, like the aged or poor, by creating credit-assistance programs that benefit those groups alone. *See id.* (providing that, to merit safe harbor, refusal of credit must be "required by or made pursuant to such program"). Programmatic efforts to assist the "economically disadvantaged" or to "meet special social needs" might naturally involve express classifications based on age or income level that favor some credit applicants, to the disadvantage of others. Indeed, that is how the CFPB's current implementing regulations construe these ECOA exemptions. *See* 12 C.F.R. § 1002.8(b)(2) (explaining that, although credit assistance programs may not discriminate "against" applicants on any prohibited basis, "program participants may be required to share one or more common characteristics," such as "race, national origin, or sex").[7] To the extent relevant,

---

[7] The CFPB has promulgated a new rule, which has not yet taken effect, that prohibits for-profit special purpose credit programs from using race, color, national origin, or sex as eligibility criteria. *See* Equal Credit Opportunity Act (Regulation B), 91 Fed. Reg. 21,620, 21,652 (Apr. 22, 2026) (to be codified at 12 C.F.R. pt. 1002). We do not opine on the constitutionality of these programs as they currently operate.

legislative history further confirms this interpretation, explaining that section 701(c) of ECOA "permits and encourages 'affirmative action' type credit programs," such as "government sponsored housing credit subsidies for the aged or the poor" or "[c]redit offered to a limited clientele by non-profit organizations." S. Rep. No. 94-589, at 4, 7.[8]

In short, each of ECOA's exemptions is compatible with the understanding that the statute creates liability only for intentional discrimination. Each can be effectuated without reading ECOA's prohibitory language—contrary to its ordinary meaning—as creating disparate-impact liability. Thus, none of ECOA's exemptions provides structural support for dispensing with ECOA's intent requirement.

## 2.

Statutory history also gives no indication that ECOA is intended to hold creditors liable for discrimination when they act without discriminatory intent. In *Inclusive Communities*, the Supreme Court found that disparate-impact liability was "supported by amendments to the FHA that Congress enacted in 1988" reflecting "a considered judgment" not to revise the statute's prohibitory language. 576 U.S. at 535–36. By 1988, "all nine Courts of Appeals to have addressed the question had concluded the Fair Housing Act encompassed disparate-impact claims," and legislative history confirmed that Congress "was aware of this unanimous precedent" when it decided to "retain the relevant statutory text." *Id.* Moreover, Congress considered and rejected "a proposed amendment that would have eliminated disparate-impact liability for certain zoning decisions." *Id.* at 536. Thus, the Court concluded that Congress's decision not to amend the FHA's prohibitory language in 1988 "ratified" disparate-impact liability. *Id.*

---

[8] The same logic distinguishes ECOA's recognition that liability does not attach to "any act done or omitted in good faith in conformity with any official rule, regulation, or interpretation thereof by the [CFPB]." 15 U.S.C. § 1691e(e). This provision, too, can be understood as licensing certain forms of intentional discrimination *in favor of* protected groups if it is undertaken pursuant to ECOA-implementing rules or regulations. Nothing about the provision facially indicates a congressional focus on immunizing conduct that could otherwise be alleged to constitute disparate-impact discrimination. *Cf. Osborne v. Bank of Am., N.A.*, 234 F. Supp. 2d 804, 811 n.4 (M.D. Tenn. 2002).

But when Congress amended ECOA in 2010, there was no settled interpretation of the statute for Congress to ratify. Nor do the statutory and legislative history of the 2010 amendments suggest that Congress intended to "accept[] and ratif[y]" any interpretation by a coordinate branch. *Id.* In 2010, and to this day, *no* court of appeals had squarely held that ECOA permits disparate-impact claims—and one had implied that it does not.[9] True, some agencies had issued a joint policy statement describing "disparate impact" as a "method" of "proof of lending discrimination" under ECOA. 59 Fed. Reg. 18,266, 18,269 (Apr. 15, 1994). But it is well established that the "prior-construction canon" does not apply when lawyers cannot "justifiably regard the point as settled." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 324–25 (2012); *see also BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 244 (2021). And the availability of disparate-impact liability was far from settled in 2010. Thus, Congress's decision not to change ECOA's prohibitory language in 2010 does not support the same inference as its decision not to change the FHA's prohibitory language.[10]

---

[9] Without deciding the issue, the Fifth, Sixth, and D.C. Circuits have assumed for purposes of argument that ECOA embraces disparate-impact liability—although the D.C. Circuit implied that it would likely have disagreed if it had reached the issue. *See Bhandari*, 808 F.2d at 1101; *Golden*, 404 F.3d at 963 & n.11; *Garcia*, 444 F.3d at 633 & n.9. Only the Ninth Circuit has explicitly stated after reasoned analysis that, under ECOA's antidiscrimination provision, "[n]o showing of any specific intent to discriminate [i]s required." *Miller v. Am. Express Co.*, 688 F.2d 1235, 1239 (9th Cir. 1982) (citation omitted). But the specific issue confronted by the Ninth Circuit was not whether disparate-impact liability exists under ECOA: It was whether a plaintiff may establish an ECOA violation without showing either discriminatory intent *or* effect, simply by showing that "a regulation promulgated under the ECOA was violated." *Id.* at 1237, 1239. The ultimate holding of *Miller* was thus that "a creditor's conduct in an individual transaction may be considered to determine the existence of credit discrimination, quite apart from intent or from a statistical showing of adverse impact." *Id.* at 1240. Nonetheless, some district courts have treated *Miller* as binding precedent on the disparate-impact issue. *See, e.g.*, *Ramirez v. GreenPoint Mortg. Funding, Inc.*, 633 F. Supp. 2d 922, 926–28 (N.D. Cal. 2008). To our knowledge, no court has considered whether ECOA permits disparate-impact claims under the framework prescribed by *Inclusive Communities*.

[10] Prior agency interpretations of ECOA do not create an independent basis, separate from the question of congressional ratification, for us to read disparate-impact liability into the statute. Even "when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time," neither we nor the courts are "at liberty to surrender, or to waive," our obligation to reach our own judgment about the meaning of a statute's text. *Loper Bright*, 144 S. Ct. at 2258.

### 3.

"Legislative history cannot undermine a meaning evident from the plain text and structure of a statute." *Interpretation of PRWORA* at *15. Thus, what has been said already should suffice to show that ECOA does not provide for disparate-impact liability. But because every contrary interpretation of ECOA has relied on legislative history, and to the extent that the Supreme Court may consider legislative history a relevant factor under the *Inclusive Communities* framework, we pause to observe that the legislative record contains no evidence of a congressional intent to impose disparate-impact liability under ECOA. We have considered three potential arguments on this score, but find none persuasive.

*First*, we see no probative value in legislative history suggesting that Congress contemplated a "flexibl[e]" "regulatory authority" when enacting ECOA, because regulatory flexibility does not equate to disparate-impact liability. *See* H.R. Rep. No. 93-1429, at 37 (1974) (Conf. Rep.). Moreover, the flexible definition of discrimination that was *deleted* from a Senate version of the bill cannot support disparate-impact liability. *See* S. 3492, 93d Cong. § 3 (1974) (Senate ECOA bill defining "discriminate" to mean "tak[ing] any arbitrary action based on any characteristic attributable to the sex or marital status of an applicant"). Even assuming this definition was flexible enough to suggest liability for discrimination based on any facially neutral trait that correlates with a protected characteristic, "Congress' rejection of the very language that would have achieved [disparate-impact liability] weighs heavily against" that interpretation. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 579–80 (2006). *But see Miller*, 688 F.2d at 1238 (implying without explanation that ECOA's meaning is reflected in text Congress chose not to enact).

*Second*, we are not moved by the fact that the Senate and House Reports accompanying the 1976 amendments to ECOA purport to authorize "courts or agencies . . . to look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions" when "determining the existence of discrimination on [protected] grounds." S. Rep. No. 94-589, at 4; *accord* H.R. Rep. No. 94-210, at 5 (1975). These sources further state that "judicial constructions of anti-discrimination legislation in the employment field, in cases such as *Griggs* . . . , are intended to serve as guides in the application of [ECOA]." S. Rep.

No. 94-589, at 4–5; *accord* H.R. Rep. No. 94-210, at 5. As already discussed, prior to the Supreme Court's holding in *Inclusive Communities*, some courts and Executive Branch agencies took these historical references to "effects" and disparate-impact caselaw as indications that ECOA, like Title VII, permits disparate-impact liability. *See, e.g.*, *Cherry v. Amoco Oil Co.*, 490 F. Supp. 1026, 1029–30 (N.D. Ga. 1980); *Williams v. First Fed. Sav. & Loan Ass'n of Rochester*, 554 F. Supp. 447, 448–49 (N.D.N.Y. 1981), *aff'd*, 697 F.2d 302 (2d Cir. 1982); *see also Golden*, 404 F.3d at 963 n.11.

Of course, by now it is clear that "legislative history is not the law." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (citation omitted). "Congress expresses itself as a body through the text it enacts; the views of [legislative committees] are not the law." *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, No. 24-345, 2026 WL 1686059, at *8 (U.S. June 11, 2026). And even if we "accept [the] invitation to consider [this] legislative history" for all it is worth, *State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. 26, 37 (2016) (citation omitted), the upshot is that it is not worth much. The 1976 amendments to ECOA (like the 2010 amendments) did not change the meaning of ECOA's already-enacted mandate not to "discriminate against" protected classes. They simply added to the classes protected by that mandate. S. Rep. No. 94-589, at 2.

Such "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress." *Jones v. United States*, 526 U.S. 227, 237–38 (1999) (cleaned up). Indeed, it is "not a legitimate tool of statutory interpretation" because it "could have had no effect on the congressional vote." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Had Congress wanted to create disparate-impact liability under ECOA in 1976, it could have amended the statute to do so—as it later amended Title VII. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, § 3(3), 105 Stat. 1071, 1071. But we cannot rely on mere "hindsight expressed in legislative history" to alter the meaning of statutory text enacted by a prior Congress. *Jones*, 526 U.S. at 238.

*Third*, we cannot assign dispositive weight to ECOA's admittedly broad purpose of helping all Americans access credit regardless of their protected status. *See* S. Rep. No. 94-589, at 4 ("In sum, this bill is intended to prevent the kinds of credit discrimination which have occurred in

the past, and to anticipate and prevent discriminatory practices in the future."); *accord* ECOA § 502, 88 Stat. at 1521 ("It is the purpose of this Act to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers without regard to sex or marital status."). Disparate-impact liability may actually undermine that purpose by discouraging the extension of credit to creditworthy individuals based on their race, sex, or other protected traits. *See Disparate-Impact Liability* at *21. And even if it were consistent with ECOA's goals, it would not follow that ECOA pursues those goals by creating disparate-impact liability. "Legislation is, after all, the art of compromise . . . , and no statute yet known pursues its stated purpose at all costs." *Stanley v. City of Sanford*, 145 S. Ct. 2058, 2067 (2025) (citation omitted).

The purpose of every antidiscrimination statute is to stop discrimination. But as the Supreme Court has recognized, that does not mean every antidiscrimination statute creates disparate-impact liability. *See Inclusive Communities*, 576 U.S. at 533. Here, ECOA's clear textual focus on the actions taken by creditors rather than on the effects experienced by borrowers reflects Congress's decision to pursue its purpose of eliminating lending discrimination through a prohibition on intentional disparate treatment, without a further prohibition on unintended disparate impacts. To be sure, as we have already noted, evidence of disparate impact may in some cases suggest that disparate treatment is afoot. *See Ricci*, 557 U.S. at 595 (Scalia, J., concurring) ("Disparate impact is sometimes . . . a signal of something illicit, so a regulator might allow statistical disparities to play some role in the evidentiary process."). But we conclude that it is not independently sufficient to establish liability under ECOA, absent overarching facts suggesting "that the defendant had a discriminatory intent or motive." *Watson*, 487 U.S. at 986.

* * * * *

ECOA's mandate that creditors not "discriminate" either "based on" or "because" of protected characteristics is best understood to prohibit only intentional discrimination, not unintended disparate impacts. Moreover, ECOA's text wholly omits the results-oriented language that the Supreme Court has always required as an indicator of disparate-impact liability. Under *Inclusive Communities* and sound principles of statutory interpreta-

tion, other indicators of ECOA's purpose cannot fill that gap. For all these reasons, the best reading of ECOA is that it prohibits only intentional discrimination and does not provide for disparate-impact liability.

SPENCER CHURCHILL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*